<table>
<tr><td>

District Court, City & County of Denver, State of Colorado
1437 Bannock Street
Denver, Colorado 80202

**PLAINTIFFS:  JOHN J. ELLERTON, C & J
RESOURCES, INC., and C & J RESOURCES
PENSION PLAN & TRUST,**

**v.**

**DEFENDANTS: SEFTON RESOURCES, INC.,
MARK R. SMITH, individually and as a director of
Sefton Resources, Inc., THOMAS G. MILNE,
individually and as a director of Sefton Resources, Inc.
and KEITH A. MORRIS, individually and as a
director of Sefton Resources, Inc.**

</td><td>

DATE FILED: May 14, 2015 2:15 PM
FILING ID: FD0D61531B3B7
CASE NUMBER: 2015CV31703

▲ COURT USE ONLY ▲
_____
Case Number:

Div.          Ctrm.

</td></tr>
</table>

Attorneys for the Plaintiffs:
BUECHLER LAW OFFICE LLC
Kenneth J. Buechler, # 30906
1621 18th Street, Suite 260
Denver, CO 80202
Tel: 720-381-0045
Fax: 720-381-0382
ken@kjblawoffice.com

**VERIFIED COMPLAINT**

JOHN J. ELLERTON, C & J RESOURCES, INC., C & J RESOURCES PENSION PLAN & TRUST (collectively the "Plaintiffs"), through their undersigned counsel, for their Verified Complaint against SEFTON RESOURCES, INC., MARK R. SMITH, individually and as a director of Sefton Resources, Inc., THOMAS G. MILNE, individually and as a director of Sefton Resources, Inc., and KEITH A. MORRIS, individually and as a director of Sefton Resources, Inc., hereby state and allege as follows:

## PARTIES

1.  John J. Ellerton ("Mr. Ellerton") is an individual and resident of the State of Hawaii.

2.  C & J Resources, Inc. ("C&J"), is a Colorado corporation with its principal place of business located at 5290 DTC Parkway, Suite 150, Englewood, Colorado 80111.

-1-

EXHIBIT A

3.   C & J Resources Pension Plan & Trust (the "Trust") is a trust established under the laws of the State of Colorado which does business at 5290 DTC Parkway, Suite 150, Englewood, Colorado 80111.

4.   Defendant Sefton Resources, Inc. ("Sefton") is a corporation established under the laws of the British Virgin Islands authorized to transact business within the State of Colorado with its principal place of business located at 2050 South Oneida Street, Suite 102, Denver, Colorado 80224.  Sefton may be served with process through its registered agent, Kris Short.  Upon information and belief, Sefton also has an office in the United Kingdom, located at 1 Northumberland Avenue, Trafalgar Square, London, WC2N 5BW, UK.  Sefton is named as a defendant because Mr. Ellerton, C&J and the Trust assert some of these claims on behalf of the corporation. Following service, Sefton may be aligned also as a plaintiff.

5.   Mark R.  Smith ("Smith") is an individual whose last known address is 2500-450 1 Street SW, Calgary, Alberta Canada T2P 5H1.  At all times relevant to this Complaint.

6.   Thomas G. Milne ("Milne") is an individual whose last known address is 1325 Cape Cod Drive, #304, Parksville, British Colombia, Canada V9P 2Y8.

7.   Keith A. Morris ("Morris") is an individual whose last known address is 23 Old Slade Lane, Iver, Bucks, United Kingdom SL0 9DY.

## JURISDICTION AND VENUE

8.   Article VI, Section 9 of the Constitution of the State of Colorado provides that the district court shall be the trial court of record with general jurisdiction and shall have original jurisdiction of all civil, probate and criminal cases, except as otherwise provided by statute and shall have such jurisdiction as may be prescribed by law.

9.   Venue of the within action is proper in Denver County pursuant to Rule 98 of the Colorado Rules of Civil Procedure for the reasons that the contract, torts and other acts which form the subject of the within action were to be performed in Denver County, Colorado and/or committed within Denver County, Colorado. The Defendant's principal place of business is also located in Denver County, Colorado.

10.   Sefton transacted its business, committed tortious acts within the State of Colorado, and/or availed itself of the laws of the State of Colorado as more fully set forth below.

-2-

11.     Mr. Smith, Mr. Milne and Mr. Morris conducted business within the State of Colorado, committed a tortious act within the State of Colorado, and/or availed themselves of the laws of the State of Colorado, as more fully set forth below.

## GENERAL ALLEGATIONS

A.      Formation and History of Sefton Resources, Inc.

12.     Sefton was formed as TEG Resources, Inc., in or around January 1995 by Mr. Ellerton and Mr. D. Haugh and Mr. R. Mendas, who were Colorado residents at the time.  Sefton was formed for the purpose of investing into oil and gas projects and related industries in the United States and elsewhere.  TEG Resources, Inc., changed its name to Sefton in or around 2000. Colorado served as the base for all of Sefton's business after its inception.

13.     Mr. Ellerton made over one-half of the capital contributions necessary to establish Sefton.  From and after Sefton's formation, Mr. Ellerton was responsible for the day to day operations of the corporation, for raising additional capital, locating suitable projects, finding additional investors, and hiring necessary administrative and operational personnel as well as consultants to the company.

14.     Initially, Mr. Ellerton took little or no salary from Sefton for his services to the corporation.  Rather, Mr. Ellerton continued to invest his own funds in Sefton often taking stock in the corporation or exchanged money owed to him (or the other Plaintiffs) into stock in Sefton in an effort to maximize Sefton's liquidity.

15.     Sefton initially acquired a majority interest in a heavy oil field in California that needed redevelopment, known as Tapia Canyon.  Sefton formed TEG Oil & Gas USA, Inc. ("TEG USA"), a Colorado corporation, for the purpose of acquiring the interest in the company (Tapia) that held ownership of the oil field in California in or around 1997.

16.     The initial owners of Tapia were Sefton Resources and the U.S. subsidiaries of two Canadian companies.  Sefton bought out its partners in Tapia prior to the year 2000.

17.     In or around December 2000, Sefton became a public company traded on the London Exchange in the United Kingdom.  At the time, its sole asset was its wholly owned subsidiary TEG USA, which owned 100% of Tapia and the Tapia Canyon oil field.

18.     Under the regulations of the London Exchange, Sefton commenced filing and

reporting publically available information about its business and financial results of operations, issued press releases, and audited financial statements to its shareholders.

19.    At the time Sefton went public, it had reported revenues exceeding $82,000 per year and the "net present day value (discounted 10%)" of Sefton's assets and reserves (including TEG USA and its Tapia Canyon asset) was in excess of $23,800,000.

20.    After Sefton went public, Mr. Ellerton continued to be the largest individual shareholder of Sefton.

21.    From and after December of 2000, Sefton continued to develop the Tapia Canyon oil field.  Mr. Ellerton continued to work as the President and Chief Executive Officer of Sefton and its subsidiaries, devoting substantial time and effort in assisting Sefton's development of its assets and exploring other opportunities for Sefton.

22.    As a result of Mr. Ellerton's efforts, Sefton became cash flow positive over the decade following its initial public offering ("IPO").

23.    Sefton acquired some producing assets in Canada after its IPO, via a new corporation it formed, TEG Oil & Gas Canada, Inc. ("TEG Canada"), an Alberta corporation, via the sale of additional equity placing in the United Kingdom, to provide additional cash flow while Tapia Canyon was being developed.  TEG Canada was later sold for a profit.

24.    Sefton also expanded its acquisitions in the United States.  Sefton formed TEG MidContinent, Inc. ("TEG MidContinent"), a Colorado corporation, in or around August of 2004.  TEG MidContinent acquired oil and gas exploration resources in the State of Kansas.  Prior to January of 2015, TEG MidContinent was a wholly owned subsidiary of Sefton.

25.    Sefton also formed TEG Transmission, LLC, a Colorado limited liability company, to acquire gas transmission facilities in the United States.  TEG Transmission is also wholly owned by Sefton.

26.    As of December, 2012, Sefton had reported revenues of approximately $4,300,000. The "net present day value (discounted 10%)" of its reported assets and reserves exceeded $133,000,000, and its shareholder equity value was in reported to be excess of $18,900,000.

27.    Sefton was cash flow positive on an annual basis for most of the decade prior to 2012. Sefton had significant cash on hand every year.  Sefton's production and

revenue generally increased over the decade prior to 2012, and Sefton made consistent capital expenditures to maintain and improve its assets. Sefton also increased its shareholder equity value over that time. All of these positive results occurred while Mr. Ellerton acted as the CEO and Chairman of Sefton.

B.      Change in Control of Sefton Resources, Inc.'s Board of Directors

28.     Following an Annual General Meeting in June of 2013, the following persons remained on Sefton's board of directors:

      a.      Mr. Ellerton;
      b.      Mr. Smith;
      c.      Mr. Milne; and
      d.      Mr. Morris.

29.     Following Mr. Ellerton's ouster in August of 2013 (as more fully discussed below), the remaining directors of Sefton caused Sefton to engage in questionable business practices, failed to exercise reasonable care and diligence in performing their duties and supervising the officers of the corporation, and failed to protect and preserve the assets of Sefton for its shareholders and creditors.

30.     Prior to Mr. Ellerton's removal, Sefton had a history of consistent financing to meet its required capital expenditures.

31.     As of December 31, 2013, according to Sefton's year end audited financials, Sefton reported a loss of approximately $13,523,000. Such loss was primarily the result of the auditors "writing down" the value of Sefton's assets, from a lack of ongoing development investment and its inability to raise sufficient capital to develop Sefton's assets, despite reported revenues of $4,727,000 for the year 2013.

32.     As of December 31, 2013, Sefton's total assets were reported to be approximately $16,122,000 with liabilities of only $8,931,000 and Sefton's shareholder equity was reduced to approximately $7,200,000 and no "net present day value (discounted 10%)" of its assets and reserves was published.

33.     By June 30, 2014 (Sefton's mid-year financial period), Sefton reported a year to date net loss of $440,000, from only $1,446,000 in revenues, continuing its financial decline. Reported shareholder equity value had declined to $6,522,000 and its liabilities increased to $9,186,000.

34.     The net operating losses of Sefton during 2014 along with the reduction in Sefton's

shareholder equity value and increased debts are directly attributable to the actions of Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, following the ouster of Mr. Ellerton.

C.    C & J Resources Consulting Agreement

35.    On or about October 1, 2010, Sefton and C&J entered into a Consultancy Agreement.  The purpose of the Consultancy Agreement was to formalize the agreement for Mr. Ellerton's services to Sefton and its subsidiaries as an independent contractor.

36.    Under the terms of the Consultancy Agreement, C&J agreed to, among other things, provide Mr. Ellerton's services as Sefton's Chief Executive Officer and/or Chairman of the Board of Directors, provide Mr. Ellerton's skill, expertise, and care in running Sefton, promote the interests of Sefton, insure Sefton's compliance with all applicable laws and regulations, etc.

37.    Under the Consultancy Agreement, Sefton agree to, among other things, compensate C&J in an annual amount of $310,674 (subject to annual increases), together with medical allowances, 401(k) contributions, third party expense reimbursement, and annual severance and/or pension plan contributions (payable to the Trust).

38.    Over time, Sefton issued shares of stock to C&J as well as to the Trust as partial payment under the Consultancy Agreement, by the consent of C&J, Mr. Ellerton and the Trust.

39.    C&J is a shareholder of Sefton.  The Trust is a shareholder of Sefton.

40.    On or about August 22, 2013, Mr. Ellerton agreed to temporarily step down as Sefton's Chairman and CEO to allow Sefton's Board of Directors sufficient time to investigate certain allegations made against Mr. Ellerton on the internet in a personal lawsuit brought by a third party against Mr. Ellerton some years before (the "Ellerton Dispute").  Mr. Ellerton's agreement to temporarily step down was premised on two conditions: (a) that the Board act in such manner as to preserve the terms of the Consultancy Agreement with C&J; and, (b) that the Board conduct a full and thorough investigation into the allegations as outlined in the August 22, 2913 press announcement by Sefton.

41.    Upon information and belief, Sefton, Mr. Smith, Mr. Milne and Mr. Morris used the Ellerton Dispute as a subterfuge to cause Mr. Ellerton to step down from Sefton's Board of Directors.

42.     On August 30, 2013, without Mr. Ellerton's or C&J's approval or consent, Sefton's Board announced that Mr. Ellerton was permanently stepping down as its Chairman and CEO.   At the time, the Board had not conducted a "full and thorough investigation" of the allegations against Mr. Ellerton.  The Board further ignored the express terms of the Consultancy Agreement that required specific procedures for Mr. Ellerton's termination from Sefton's Board of Directors and as a consultant to Sefton.

43.     Since his unlawful ouster, Mr. Ellerton (together with staff and consultants) has gone to great lengths to provide Sefton and its Board (and the US and U.K. regulatory authorities) with information to assist a "full and thorough investigation" of the Ellerton Dispute. For example, in October of 2013, Mr. Ellerton submitted to Sefton's Board (among others) a data package that included a summary of the internal investigation into the allegations, letters from Sefton's auditors, and third party legal opinions as to Mr. Ellerton's alleged improprieties. All of this evidence clearly showed that Mr. Ellerton acted properly in connection with the Ellerton Dispute and maintained the independence of the Ellerton Dispute from Sefton and its operations. In no way did Mr. Ellerton or C&J breach the Consultancy Agreement with Sefton.

44.     In response, the Board failed to reinstate Mr. Ellerton as Sefton's Chairman and CEO.  Sefton then unilaterally terminated the Consultancy Agreement on or about October 23, 2013 effective December 31, 2013, without meeting the obligations therein.

45.     Sefton, Mr. Smith, Mr. Milne and Mr. Morris continued to use the Ellerton Dispute for the termination of Mr. Ellerton from Serton's Board of Directors.

46.     In a letter dated October 25, 2013 from Sefton to Mr. Ellerton, Sefton admitted that its actions had caused Sefton to breach the Consultancy Agreement with C&J.

47.     In November 2013, Sefton's Board went so far as to instruct Sefton's employees to not have any direct communication with Mr. Ellerton.

48.     At the time, Mr. Ellerton, C&J and the Trust were (and remain) shareholders of Sefton.

49.     C&J, through Mr. Ellerton, then advised Sefton and its Board of its breaches of the Consultancy Agreement, including, but not limited to:
        a.      improper termination;

b.    deprivation of access to Sefton's support staff, hindering Mr. Ellerton's ability to perform the services as required;

c.    failure to reimburse Mr. Ellerton and C&J for all necessary documented expenses within 10 days of submission of documentation;

d.    failure to pay the Termination Fee;

e.    failure to pay additional Consulting Fees; and,

f.    unpaid loans, additional benefits and third party expenses payable and due.

50.    In Sefton's audited financials of December 31, 2013, Sefton's own auditors found support for Sefton's breaches of the Consultancy Agreement.

51.    As a result of Sefton's breach of the Consultancy Agreement, C&J initiated an arbitration against Sefton to recover all sums due and owing and damages.

52.    As of the filing of this Complaint, Sefton owes C&J in excess of $316,700 as a result of Sefton's breach of the Consultancy Agreement.

53.    Sefton also is required to reimburse C&J for its legal expenses and costs incurred in actions against Mr. Ellerton while performing his duties for Sefton. As of the filing of this Complaint, C&J is owed over $40,000 for legal expenses and costs incurred by C&J.

54.    As of the filing of this Complaint, Sefton owes the Trust approximately $19,546, for the unpaid pension plan contributions required under the Consultancy Agreement.

55.    C&J, Mr. Ellerton and the Trust have provided a written demand to Sefton, with proof of all amounts owed. Sefton has failed to pay despite such demand.

**D.**    Mr. Ellerton's Loans and Expenses

56.    While Mr. Ellerton was serving as an officer and director of Sefton, Mr. Ellerton made a personal loan in the principal amount of $10,000 to Sefton (the "Ellerton Loan") on or about August 29, 2013. The Ellerton Loan is evidenced by, among other things, a check payable to Sefton from Mr. Ellerton's personal account, as well as the communications between the parties.

57.    Defendant Sefton recorded the receipt of Mr. Ellerton's funds on its books and records as a loan from shareholder. Such amounts were also confirmed by Sefton's auditors.

58.    Mr. Ellerton provided the Ellerton Loan to Defendant Sefton with the expectation

that such funds would be repaid upon demand with interest thereon at the current market rate.

59.    Mr. Ellerton also incurred business expenses on behalf of Sefton (the "Ellerton Expenses"). As Sefton did not have its own credit cards, Mr. Ellerton used his personal credit cards to pay for the Ellerton Expenses. The total principal amount of the Ellerton Expenses is approximately $35,700 as of the filing of this Complaint. These amounts were also confirmed by Sefton's auditors.

60.    Prior to filing this Complaint, Mr. Ellerton provided Sefton with documentation supporting the Ellerton Expenses.

61.    Mr. Ellerton incurred the Ellerton Expenses for Sefton with the expectation that such funds would be repaid upon demand.

62.    Mr. Ellerton has made written demand upon Sefton for repayment of the Ellerton Loan and Ellerton Expenses in full.

63.    Defendant Sefton has failed to repay the Ellerton Loan and Ellerton Expenses to Mr. Ellerton.

E.    Hawker Energy Transaction

64.    TEG USA, Sefton's principal asset, was the owner of the Tapia oil field. At the time of the initial acquisition, the field was making approximately 18 BOPD/200 BWPD.

65.    From and after the acquisition of the Tapia oil field, Sefton, through TEG USA improved the infrastructure of the facilities, and increased drilling and production. By mid-2005, oil production had increased to approximately 200 BOPD, primarily by drilling five infill development wells.

66.    From 2006 through 2012, an additional 11 wells were drilled in the Tapia oil field. At the same time, Sefton, through TEG USA, re-built the oilfield from the ground up into an operation that received operations awards of excellence from the State of California four years in a row. All of these actions occurred while Mr. Ellerton was CEO and Chairman of Sefton.

67.    By the end of 2012, the "net present day value (discounted 10%)" of TEG USA's reported assets and reserves was approximately $107,428,000 and shareholder equity value of Sefton was $19,800,000.

68.     As a result of these solid performing assets, Sefton, TEG USA and TEG MidContinent were able to secure a credit facility from Bank of the West ("Bank") in or around October 2008 pursuant to the terms of an Amended and Restated Credit Agreement (the "Credit Facility").    Initially, the Credit Facility was for approximately $1,300,000.    Over time, the Credit Facility was increased to $7,500,000, although it was subsequently reduced to less than $5,000,000.

69.     The Credit Facility was secured by all of Sefton's assets, including TEG USA and its assets.

70.     The Credit Facility came due January 1, 2014. Prior to the maturity of the Credit Facility, the Bank gave formal notice to Sefton that the Bank was not going to renew the Credit Facility and that the outstanding loan balance of approximately $4,700,000 was due and payable in full.

71.     As of January 1, 2014, Sefton, TEG USA and TED MidContinent lacked sufficient funds on hand to fully satisfy the outstanding balance owed on the Credit Facility.

72.     One of the many reasons Sefton, TEG USA and TED MidContinent lacked the ability to satisfy the Credit Facility was that Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, ignored the financing opportunities as presented by Mr. Ellerton.

73.     During 2014, Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, engaged in several short term financing transactions and borrowings in order to obtain the Bank's forbearance on the matured Credit Facility.

74.     One such provider was Hanover Holdings I, LLC ("HHI"), an affiliate fund of Magna Group, LLC.  In or around January of 2014, HHI provided $210,000 in return for an unsecured convertible note [conversion price was to be at 85% of the volume weighted average price ("VWAP") for the five trading days prior to conversion].  In addition, Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, authorized the issuance of over two million shares of stock in Sefton to Magna Group, LLC.  Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, also issued over five million common stock warrants to Magna Group, LLC.

75.     Throughout 2014, Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, continued to issue additional shares of stock to HHI as HHI converted its loan to stock in Sefton.

76.     These issuance of stock to HHI diluted the shares held by Mr. Ellerton, C&J and the Trust and depressed Sefton's stock price.

77.     At the same time, Sefton's oil production and revenues dropped off significantly while Sefton's (and TEG USA's) liabilities substantially increased.

78.     Another provider of interim financing was Hawker Energy, LLC, a wholly owned subsidiary of Sara Creek Gold Corp.  In September of 2014, Sara Creek Gold Corp. changed its name to Hawker Energy, Inc. (hereinafter "Hawker")

79.     During 2014, Hawker advanced approximately $1,500,000 to Sefton and TEG USA; $1,300,000 of this was paid to the Bank to obtain several forbearance agreements extending the Credit Facility to December 31, 2014.  The advances by Hawker increased the balance of Sefton's subordinated debt to over $1,500,000.

80.     In July of 2014, Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, called an Extraordinary General Meeting ("EGM"). The purpose of the EGM was to approve a restructuring of Sefton's activities and the financing from Hawker ("Hawker Transaction No. 1").  A key provision to this restructuring was that Hawker acquire 80% of Tapia, LLC (to which TEG USA was supposed to transfer all of its assets), leaving TEG USA with the remaining 20%.  In order to acquire a controlling interest in Tapia, LLC, Hawker would allegedly pay TEG USA $3,000,000 in a form of an unsecured promissory note.

81.     Pursuant to the Hawker Transaction No. 1, Hawker would also extend additional loans to Sefton and TEG USA all of which would go to refinance the Credit Facility and meet Sefton's ongoing liabilities.

82.     Immediately prior to the July 2014 EGM, on or about July 21, 2014, Sefton's Board of Directors issued new shares to Mr. Smith, Mr. Milne and Mr. Morris in a purported settlement of outstanding accounts payable, employee compensation and directors' fees and expenses.  Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, then back dated the issuance to July 18, 2014 in order for Mr. Smith, Mr. Milne and Mr. Morris to vote these new shares at the July 2014 EGM.

83.     These shares were issued after the record date for the July 2014 EGM, while Sefton was in the "quiet period" before the July 2014 EGM, and prior to Sefton reporting its mid-year financial results (June 30, 2014). At the time, the Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, was in possession of price sensitive information, including Sefton's production and revenues, status of the Bank debt, the engineering evaluation of Sefton's assets and reserves, and other pertinent financial

-11-

data, as well as knowledge of the EGM voting. The Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, did not share this information with Sefton's shareholders as a whole, nor did they share relevant information about Hawker's financial status.

84. These issuance of additional stock to the Directors similarly diluted the shares held by Mr. Ellerton, C&J and the Trust as well as causing the price of Sefton's stock to decline.

85. The Board of Directors of Sefton, including Mr. Smith, Mr. Milne and Mr. Morris, then voted to approve Sefton's sale of essentially 80% of Tapia, LLC (and thus TEG USA and its assets) to Hawker, while a large number of shares voted against approval. C&J's and the Trust's shares were unilaterally disqualified from voting despite a legal opinion permitting the exercise of their voting rights.

86. Immediately prior to the July 21, 2014 EGM, on May 31, 2014, Hawker reported to the SEC that it had only $1,361,488 in assets with liabilities of $1,297,566. Moreover, Hawker reported a net operating loss for the three months ending May 31, 2014 of over $400,000.

87. According to the 10-K report filed by Hawker with the SEC, as of August 31, 2014, Hawker had total assets of only $1,382,825, and liabilities of $2,809,978, resulting in a deficit of approximately $1,427,153. In its 10-K report, Hawker further explains that it had a working capital deficit in the amount of $1,109,153. Moreover, Hawker incurred a net loss of $1,696,236 during the year ended August 31, 2014, and an accumulated net loss of $2,047,462. The Hawker Transaction No. 1 was not reported in Hawker's 10-K report of August 31, 2014.

88. Hawker was therefore effectively insolvent at the time of the July 21, 2014 EGM.

89. Based upon the financial condition of Hawker, as reported to the SEC, Hawker did not have the ability to fully fund and consummate Hawker Transaction No. 1.

90. Hawker's insolvency was never disclosed to the shareholders of Sefton prior to the July 2014 EGM.

91. At a minimum, Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, failed to investigate the financial health of Hawker, failed to make appropriate disclosures to Sefton's shareholders, failed to properly oversee the Hawker Transaction No. 1, and allowed inadequate controls and/or inadequate reporting to persist within the Board of Directors and management of Sefton.

92.     After the July 2014 EGM, Hawker only provided Sefton and TEG USA with approximately $600,000 as a loan.  The majority of such funds were immediately paid to the Bank to obtain additional forbearances of the Credit Facility.  As such, Hawker Transaction No. 1. was never fully consummated.

93.     Instead, in or around January 2015, Sefton and Hawker entered into a revised agreement ("Hawker Transaction No. 2").  Under this agreement, Hawker would acquire 100% of TEG USA in exchange for an assumption of certain liabilities (including the Credit Facility), the issuances of 3,000,000 shares of stock in Hawker, and 5,000,000 warrants for Hawker stock.  Hawker would again loan funds to TEG USA to pay to the Bank to acquire an additional forbearance of the Credit Facility to December 31, 2015.

94.     Under Hawker Transaction No. 2 however, Sefton and TEG MidContinent continued to be liable on the Credit Facility.

95.     According to Hawker's 10-Q report filed with the SEC for the period ending November 30, 2014, Hawker had total assets of $2,313,316 and liabilities of $3,451,170.  For the three months ending November 30, 2014, Hawker reported a negative operating cash loss of over $1,610,000.

96.     Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, held another EGM in January of 2015 to approve Hawker Transaction No. 2.  Hawker Transaction No. 2 was approved at such meeting, again with limited financial and engineering data provided for shareholders to make an informed decision.

97.     Hawker was insolvent at the time of Hawker Transaction No. 2.

98.     Hawker's insolvency was not disclosed to the shareholders of Sefton prior to the January 2015 EGM. Neither was Sefton's true financial condition disclosed to Sefton's shareholders.

99.     At a minimum, Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, failed to investigate the financial health of Hawker, failed to make appropriate disclosures to Sefton's shareholders, failed to properly oversee the Hawker Transaction No. 2,  and allowed inadequate controls and/or inadequate reporting to persist within the Board of Directors and management of Sefton.

100.    The net result of Hawker Transaction No. 2, left Sefton still liable on the Credit Facility, and holding worthless stock of an insolvent company.

101.   Throughout the course of 2014, and while Sefton's Board of Directors was soliciting shareholder approval of the Hawker Transactions Nos. 1 and 2, Sefton's Board made ongoing threats of needing to file bankruptcy as the alternative to the Hawker fundings.

102.   On January 30, 2015, Sefton issued a press release admitting that following the sale of TEG USA to Hawker, Sefton was in a position where it would not generate any operational cashflow. The only way Sefton could meet its significant outstanding payables from operational cash flows was to generate working capital from selling additional shares of the Corporation and/or assets within other subsidiaries.

103.   On March 20, 2015, Sefton announced that it and TEG MidContinent has been removed as borrowers from the Credit Facility and that their assets were released from the Bank's collateral.  To facilitate such action, Hawker was required to issue a promissory note to Sefton and TEG MidContinent in the amount of the Credit Facility.  Sefton was required to return the stock and warrants in Hawker issued under the Hawker Transaction No. 2.

104.   Based upon the information supplied by Hawker to the SEC, Hawker remains insolvent as of the date of this Complaint.  Thus, the promissory note issued by Hawker to Sefton and/or TEG MidContinent in March of 2015 is essentially worthless.

105.   As a result of this revised transaction, Sefton transferred a valuable asset, TEG USA, for less than reasonably equivalent value, leaving Sefton with no cash flow and limited assets to meet its remaining financial obligations.

106.   At a minimum, Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, failed to investigate the financial health of Hawker, failed to make appropriate disclosures to Sefton's shareholders, failed to properly oversee this transaction, and allowed inadequate controls and/or inadequate reporting to persist within the Board of Directors and management of Sefton.

F.   Insolvency Allegations

107.   According to Sefton's audited financial statements as of December 31, 2013, Sefton's auditors advised Sefton of specific terms and conditions that Sefton would need to meet in order to survive as an ongoing concern.  Sefton has failed to meet those terms and conditions since that time.

-14-

108.    Sefton lacks the ability to pay its debts as they become due in the ordinary course of its business.

109.    Sefton has failed to timely and fully repay its indebtedness to the Plaintiffs in the ordinary course of its business.

110.    Based upon the filings to the SEC by Hawker and Sefton's own press releases, Sefton lacks sufficient assets to pay all of its liabilities, including the liabilities owed to the Plaintiffs.

111.    Sefton is insolvent.

112.    Insolvency is defined as the inability to fulfill one's obligations according to his undertaking, and a general inability to answer in court for all of one's liabilities that are existing and capable of being enforced; not an absolute inability to pay at some future time, ... but ... not being in condition to pay one's debts in the ordinary course, as persons carrying on trade usually do. *Walton v. First Nat'l Bank*, 13 Colo. 265, 273, 22 P. 440, 442 (1889). *See also, Glenn Justice Mortgage Co. v. First Nat'l Bank*, 592 F.2d 567, 572-73 (10th Cir.1979) (applying Colorado law) ("While the balance sheet test reflects the general meaning of 'insolvency,' the term is also used to indicate 'the inability of one to pay his debts as they become due in the ordinary course of his business'" (quoting 42 Am.Jur.2d Insolvency § 1 (1969))). *See also Paratransit Risk Retention Group Ins. Co. v. Kamins*, 160 P.3d 307, 318 (Colo.App. 2007) (establishing five part test for insolvency).

113.    Defendant Sefton meets the "balance sheet" test and/or the "ordinary course" test of insolvency under Colorado law.

114.    Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, engaged in a lack of proper oversight and failed to implement proper accounting controls to prevent Sefton's insolvency.

115.    Sefton transferred its primary asset, TEG USA, to Hawker outside the ordinary course of business, for largely worthless consideration, to the detriment of Sefton's shareholders and creditors, including the Plaintiffs.

116.    Upon information and belief, the remaining assets of Defendant Sefton, along with the rents, issues and profits therefrom, are in danger of being lost, removed beyond the jurisdiction of the court, or materially injured or impaired.

117.    Upon information and belief, Sefton has and/or is attempting to close its business

office in Denver, Colorado and move its business location to the United Kingdom.

118.    Upon information and belief, Sefton has caused the transfer of its assets with the actual intent to hinder, delay and defraud its shareholders and creditors, including the Plaintiffs.

119.    At a minimum, Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, caused Sefton to engage in economically questionable transactions at a time they knew or should have known of Sefton's insolvency, engaged in self dealing, and knew the impact of their actions would cause injury to the shareholders of Sefton, including the Plaintiffs.

G.    Derivative Allegations

120.    Mr. Ellerton is a shareholder of Sefton. Mr. Ellerton was a shareholder of Sefton at all times relevant to this Complaint.  Mr. Ellerton brings this action to enforce the rights that Sefton may properly assert but has failed to enforce.  Mr. Ellerton fairly and adequately represents the interests of the shareholders of Sefton who are similarly situated in enforcing the rights of the corporation.

121.    C&J is a shareholder of Sefton. C&J was a shareholder of Sefton at all times relevant to this Complaint.  C&J brings this action to enforce the rights that Sefton may properly assert but has failed to enforce.  C&J fairly and adequately represents the interests of the shareholders of Sefton who are similarly situated in enforcing the rights of the corporation.

122.    The Trust is a shareholder of Sefton. The Trust was a shareholder of Sefton at all times relevant to this Complaint.  The Trust brings this action to enforce the rights that Sefton may properly assert but has failed to enforce.  The Trust fairly and adequately represents the interests of the shareholders of Sefton who are similarly situated in enforcing the rights of the corporation.

123.    This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

124.    Prior to filing this action, the Plaintiffs made numerous written demands upon Sefton and its Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, to correct the actions taken, including, but not limited to, restoring Mr. Ellerton to his status as Chairman and CEO of Sefton.  Mr. Ellerton participated in the July 2014 EGM but was denied the ability to ask questions or seek any additional information concerning the transactions approved by the Board.

125.    The Plaintiffs made demand upon Sefton for all of the books, records and financial information of Sefton, which demands have been refused or ignored.  The Plaintiffs are therefore forced to rely solely upon the public filings and press releases of Sefton.

126.    To the extent that any other demand is required, the Plaintiffs assert that such demand is fruitless as Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris,  were not disinterested and independent, as more fully set forth above and below.

127.    Mr. Smith, Mr. Milne and Mr. Morris controlled Sefton's Board of Directors following their improper termination of Mr. Ellerton in August of 2103.

128.    Mr. Smith, Mr. Milne and Mr. Morris controlled Sefton's Board of Directors during 2014, during all of the Hawker Transactions and through the present.

129.    Despite the Plaintiffs' demands, Sefton's Board of Directors has refused to account for, among other things, the shares issued to the Board of Directors immediately prior to the July 2014 EGM, including the back dating of the issuance of shares to Mr. Smith, Mr. Milne and Mr. Morris.

130.    Upon information and belief, Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, are operating Sefton like it was their own company to the detriment of the other shareholders of Sefton, including the Plaintiffs.

## FIRST CLAIM FOR RELIEF
(Breach of Fiduciary Duty - Sefton v. Board)

131.    The Plaintiffs incorporate by this reference the allegations set forth in paragraphs 1 through 130 as though more fully set forth in this Claim for Relief.

132.    The Plaintiffs bring this claim derivatively on behalf of Sefton.

133.    As directors of Sefton, Mr. Smith, Mr. Milne and Mr. Morris owed statutory and other duties to Sefton and its shareholders.

134.    Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, were required to act in the best interests of Sefton and to not act in their own personal interest to the detriment of Sefton.

135.   Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris breached their statutory and other duties owing to Sefton by, among other things, engaging in the Hawker Transactions at a time when both Sefton and Hawker were insolvent, issuing Mr. Smith, Mr. Milne and Mr. Morris sufficient shares of stock to insure the approval of the Hawker Transactions, and as more fully discussed above and below.

136.   As a direct and proximate cause of Sefton's Board of Directors, including Mr. Smith's, Mr. Milne's and Mr. Morris', breaches of their fiduciary duties, Sefton has been damaged by, among other things, the transfer of TEG USA to Hawker, the loss in revenues, the increased liabilities, and other financial damages to be proven at trial or hearing.

137.   As a direct and proximate cause of Sefton's and its directors' breaches of their fiduciary duties, the Plaintiffs and other shareholders of Sefton have been damaged in the amounts set forth above, plus interest, costs, attorney fees, and any other sums provided by law.

WHEREFORE, the Plaintiffs respectfully requests that this Court enter judgment in favor of Sefton and against Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, individually and in their capacity as directors of Sefton, jointly and severally, in the amount to be proven at trial or hearing, plus interest, costs, attorney fees, expert witness fees, and any other sums provided by law, and for such other and further relief as this Court deems appropriate.

## SECOND CLAIM FOR RELIEF
(Civil Conspiracy - Sefton v. Board)

138.   The Plaintiffs incorporate by this reference the allegations contained in paragraphs 1 through 137 above as though more fully set forth in this Claim for Relief.

139.   The Plaintiffs bring this claim derivatively on behalf of Sefton.

140.   Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris,, agreed, by words, conduct or both, to, among other things, deprive Sefton of its valuable assets, including, but not limited to, TEG USA.

141.   One or more acts were performed to accomplish the goal of depriving Sefton of its assets, by Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, including, but not limited to, the fraudulent transfer of money and property of Sefton to Hawker.

-18-

142.     Sefton has incurred damages and/or losses, including but not limited to, the value of TEG USA.

143.     Sefton's damages and/or losses were caused by the acts of Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris as described herein.


WHEREFORE, the Plaintiffs respectfully requests that this Court enter judgment in favor of Sefton and against Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, individually and in their capacity as directors of Sefton, jointly and severally, in the amount to be proven at trial or hearing, plus interest, costs, attorney fees, expert witness fees, and any other sums provided by law, and for such other and further relief as this Court deems appropriate.

### THIRD CLAIM FOR RELIEF
(Breach of Duty of Good Faith & Fair Dealing - Sefton v. Board)

144.     The Plaintiffs incorporate by this reference the allegations set forth in paragraphs 1 through 143 as though more fully set forth in this Claim for Relief.

145.     Sefton promulgated new Memorandum and Articles of Association (akin to Bylaws and Articles of Incorporation) for the incorporation and governance of Sefton, to which the shareholders of Sefton were bound.  Such agreement are valid contracts between the shareholders of Sefton and Sefton.

146.     The common law, Uniform Commercial Code, and Restatement (Second) of Contracts impose on a party to a contract a duty of good faith and fair dealing.

147.     Sefton has breached this duty of good faith and fair dealing they owed to its shareholders, including the Plaintiffs, by, among other things:

   a.     failing to timely and fully pay the Plaintiffs all sums due and owing;
   b.     failing to properly operate and manage the affairs of Sefton;
   c.     failing to disclose the insolvency of Hawker as part of the Hawker Transactions Nos. 1 and 2;
   d.     improperly issuing the Directors of Sefton additional Shares immediately prior to the July 21, 2014 EGM;
   e.     misrepresenting additional compensation, payments and disbursements to the Board of Directors; and,
   f.     transferring TEG USA to Hawker for little or no consideration.

148.    As a result of Sefton's conduct, Sefton's shareholders, including the Plaintiffs, have been damaged in an amount  to proved at trial or hearing, including, but not limited to, the diminution of value of their stock prior to the ouster of Mr. Ellerton.


WHEREFORE, the Plaintiffs respectfully requests that this Court enter judgment in favor of Sefton and against Sefton's Board of Directors, including Mr. Smith, Mr. Milne and Mr. Morris, individually and in their capacity as directors of Sefton, jointly and severally, in the amount to be proven at trial or hearing, plus interest, costs, attorney fees, expert witness fees, and any other sums provided by law, and for such other and further relief as this Court deems appropriate.

### FOURTH CLAIM FOR RELIEF
(Breach of Fiduciary Duty - Plaintiffs)

149.    The Plaintiffs incorporate by this reference the allegations set forth in paragraphs 1 through 148 as though more fully set forth in this Claim for Relief.

150.    As an insolvent company, Sefton held and controlled all of its assets for the benefit of its creditors and shareholders.

151.    As an insolvent company, Sefton and its directors owe fiduciary duties to its creditors, including the Plaintiffs.

152.    Sefton and its directors owe fiduciary duties to Sefton's shareholders, including the Plaintiffs.

153.    Sefton and its directors were required to act in the best interests of its shareholders and/or creditors and to not act in their own personal interest to the detriment of the Plaintiffs.

154.    Sefton and its directors breached their fiduciary duties owing to the Plaintiffs by, among other things, engaging in the Hawker Transactions at a time when both Sefton and Hawker were insolvent, wrongfully issuing the directors sufficient shares of stock to insure the approval of the Hawker Transactions, and as more fully discussed above and below.

155.    As a direct and proximate cause of Sefton's and its directors' breaches of their fiduciary duties, Sefton's creditors and shareholders have been damaged by, among other things, the transfer of TEG USA to Hawker, the loss in revenues, the increased liabilities, and other financial damages to be proven at trial or hearing.

156.    As a direct and proximate cause of Sefton's and its directors' breaches of their fiduciary duties, the Plaintiffs have been damaged in the amounts set forth above, plus interest, costs, attorney fees, and any other sums provided by law.

WHEREFORE, the Plaintiffs respectfully requests that this Court enter judgment in their favor and against Sefton in the amount to be proven at trial or hearing, plus interest, costs, attorney fees, expert witness fees, and any other sums provided by law, and for such other and further relief as this Court deems appropriate.

### FIFTH CLAIM FOR RELIEF
(Breach of Contract - Ellerton v. Sefton)

157.    The Plaintiffs incorporate by this reference the allegations set forth in paragraphs 1 through 156 as though more fully set forth in this Claim for Relief.

158.    Mr. Ellerton entered into agreements with Sefton to loan the Ellerton Loan and for the reimbursement of the Ellerton Expense. Such loan and sums were payable upon demand.  Such agreements constituted contracts between the parties.

159.    Mr. Ellerton has made demand upon Sefton to pay all sums due and owing, which has been refused or ignored.

160.    Defendant Sefton has breached the terms of its contracts with Mr. Ellerton by, among other things, failing to timely and fully remit all sums due and owing to Mr. Ellerton on the Ellerton Loan and for the Ellerton Expenses.

161.    Mr. Ellerton has suffered economic damages as a result of Defendant Sefton's breach of contract, in an amount of at least $45,700 together with interest thereon at the agreed rate as well as moratory interest for the loss of use of his funds.

162.    Mr. Ellerton has also suffered damages in the amount of his attorney's fees and costs as provided by law and/or agreement.

WHEREFORE, Mr. Ellerton respectfully requests that this Court enter judgment in his favor and against Defendant Sefton in the principal amount of at least $45,700 together with Mr. Ellerton's interest, moratory interest, taxable costs, and all of Mr. Ellerton's attorney's fees and costs, as provided by law and/or agreement, and grant such other and further relief as this Court deems appropriate.

## SIXTH CLAIM FOR RELIEF
(Breach of Contract - C&J and Trust v. Sefton)

163.   The Plaintiffs incorporate by this reference the allegations set forth in paragraphs 1 through 162 as though more fully set forth in this Claim for Relief.

164.   C&J entered into the Consultancy Agreement with Sefton, which constituted a contract between the parties.

165.   The Trust is a third party beneficiary of the Consultancy Agreement.

166.   Sefton has breached the Consultancy Agreement by, among other things:
   a.   improper termination of Mr. Ellerton;
   b.   deprivation of access to Sefton's support staff, thereby hindering Mr. Ellerton's ability to perform the services as required;
   c.   failure to reimburse Mr. Ellerton and C&J for all necessary documented expenses within 10 days of submission of documentation;
   d.   failure to pay the Termination Fee;
   e.   failure to pay additional Consulting Fees; and,
   f.   unpaid loans, additional benefits and third party expenses payable and due.

167.   C&J and the Trust have made demand upon Sefton to pay all sums due and owing under the  which has been refused or ignored.

168.   Defendant Sefton has breached the terms of its contracts with the Plaintiffs by, among other things, improper termination of Mr. Ellerton, failing to timely and fully remit all sums due and owing to C&J and the Trust.

169.   C&J and the Trust have suffered economic damages as a result of Defendant Sefton's breach of contract, in an amount of at least $376,283, together with interest thereon at the agreed rate as well as moratory interest for the loss of use of their funds.

170.   C&J and the Trust have suffered other damages including, but not limited to, the improper termination of Mr. Ellerton, loss of benefits under the Consultancy Agreement, loss of value to their shares of Sefton, and damage to Mr. Ellerton's professional reputation.

171.   C&J and the Trust has also suffered damages in the amount of their attorney's fees and costs as provided by law and/or agreement.

WHEREFORE, C&J and the Trust respectfully requests that this Court enter judgment in their favor and against Defendant Sefton in the principal amount of at least $376,283, together with C&J's and the Trust's interest, moratory interest, taxable costs, and all of their attorney's fees and costs, as provided by law and/or agreement, and grant such other and further relief as this Court deems appropriate.

## SEVENTH CLAIM FOR RELIEF
(Unjust Enrichment & Quantum Meriut - Plaintiffs v. Sefton)

172.  The Plaintiffs incorporate by this reference the allegations contained in paragraphs 1 through 171 above as though more fully set forth in this Claim for Relief.

173.  To the extent that a contract does not govern the debts of Sefton to the Plaintiffs, the Plaintiffs plead this claim in the alternative.

174.  The Plaintiffs conferred benefits upon Defendant Sefton, including, but not limited to, the Ellerton Loan, the Ellerton Expenses, the services of C&J to Sefton, the services of Mr. Ellerton.

175.  Defendant Sefton has appreciated or realized the benefit conferred by the Plaintiffs without payment to the Plaintiffs.

176.  Defendant Sefton is liable to the Plaintiffs under the theories of Quantum Meruit, Quantum Valebot, and/or Unjust Enrichment, for the value of the benefits conferred upon Sefton.

WHEREFORE, the Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendant Sefton in the amount to be proven at trial or hearing, together with the Plaintiffs' taxable costs, and all of the Plaintiffs' attorney's fees and costs, as provided by law and/or agreement, and grant such other and further relief as this Court deems appropriate.

## **RIGHT TO AMEND**

The Plaintiffs reserve the right to amend this Complaint, the claims, defenses, and damages, under C.R.C.P. 15, as additional or supplemental facts and information becomes known to them under C.R.C.P. 26(a)(1) and (e) or otherwise.

## **VERIFICATION**

STATE OF _____                )
                                                   ) ss.
COUNTY OF _____            )

The undersigned, upon oath, depose and states that he has read the foregoing **VERIFIED COMPLAINT,** and knows the contents thereof and the same are true and correct to the best of his knowledge, information and belief and as to such matters, he believes them to be true.


_____
John J. Ellerton


SUBSCRIBED AND SWORN to before me this _____ day of May, 2015, by John J. Ellerton.


Witness my hand and official seal.        _____
                                                                    Notary Public

My commission expires:_____

DATED this 14th day of May, 2015.        Respectfully submitted,
                                                                 BUECHLER LAW OFFICE, L.L.C.

                                                                 *S/ Kenneth J. Buechler*
                                                                 _____
                                                                 Kenneth J. Buechler, #30906

*Original signature is on file with the law offices of Buechler Law Office, L.L.C. pursuant to C.R.C.P. 121, §1-26(7).*

## RIGHT TO AMEND

The Plaintiffs reserve the right to amend this Complaint, the claims, defenses, and damages, under C.R.C.P. 15, as additional or supplemental facts and information becomes known to them under C.R.C.P. 26(a)(1) and (e) or otherwise.

## VERIFICATION

STATE OF _Hawaii_   )
                    ) ss.
COUNTY OF _Maui_    )

The undersigned, upon oath, depose and states that he has read the foregoing **VERIFIED COMPLAINT,** and knows the contents thereof and the same are true and correct to the best of his knowledge, information and belief and as to such matters, he believes them to be true.

_____
John J. Ellerton

SUBSCRIBED AND SWORN to before me this _11th_ day of May, 2015, by John J. Ellerton.

Witness my hand and official seal.

_____
Notary Public _Danny Simpson_

My commission expires: _11-14-2018_

DATED this ___ day of May, 2015.          Respectfully submitted,
                                          BUECHLER LAW OFFICE, L.L.C.

                                          _____
                                          Kenneth J. Buechler, #30906

*Original signature is on file with the law offices of Buechler Law Office, L.L.C. pursuant to C.R.C.P. 121, §1-26(7).*

Doc. Date: _5/11/2015_   # Pages: _25_
Notary Name: _Danny Simpson_   Second Circuit
Doc. Description:
_Verified Complaint_
_____   _5/11/2015_
Notary Signature                Date

-24-